OPINION
Derrick Scales (Scales) was charged with aggravated menacing, resisting arrest, and obstructing justice. After a bench trial, the trial court found Scales guilty of aggravated menacing and resisting arrest. The court imposed jail terms, fines, and court costs, and suspended all of the jail time and part of the fines.
In a single assignment of error on appeal, Scales contends that the guilty findings were against the manifest weight of the evidence. In disposing of this appeal, we are guided by State v. Thompkins (1997),78 Ohio St.3d 380, 387.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").
In this case, Patrolman Brad Williams of the Trotwood Police Department testified on behalf of the State, and Scales and his wife, Misty Scales, testified in Scales' defense.
Ptl. Williams' testimony, which the trial court chose to credit, was as follows:
 Williams had eighteen years law enforcement experience. On July 22, 1999, Williams was chasing Scales' brother, Samuel Scales, and observed Samuel Scales enter the rear door of what turned out to be the residence of Derrick and Misty Scales. Williams sought Scales' permission to enter his home to continue the pursuit, but Scales refused Williams' request, telling him he couldn't enter without a warrant. Scales told Williams to leave his property "or he'd turn his dog loose on (him"). The dog was a pit bull that was chained in the backyard barking. Williams told Scales not to release the dog, but Scales approached the dog. Williams ordered Scales to stop, but Scales ignored that command. At that point, Williams told Scales he was under arrest.
 Q. (by Prosecutor) When he went towards the dog, and in light of the threat he made about turning the dog loose on you, when he was continuing to go towards the dog, did that cause you to believe that through the use of the dog, Mr. Scales would cause you serious physical harm?
 A. It was my belief he was using it like a firearm or any other weapon. He was using the dog to assault a police officer, myself.
 Q. I asked you: Did you believe that the dog, if unleashed, would cause you serious physical harm?
A. Yes.
 Q. As a result of that concern, what did you do next?
 A. I ordered him to stop. I drew my service revolver, fearing he would turn the dog loose and the dog would attack me. He continued. He refused to comply. I chose to run up to him — after I told him he was under arrest, I chose to run up to him prior to him getting to the dog's collar and sprayed him with pepper — pepper spray.
Q. And then what happened?
A. I went to grab him then.
Q. What was your intention in grabbing him?
 A. I was going to place him in custody, take him into custody for the arrest.
 Q. At this point, you already told him he was under arrest, is that correct?
A. That's correct.
 Q. At this point, he's under arrest for the alleged offense of aggravated menacing?
A. That's correct.
 Q. So what occurs when you attempt to handcuff Mr. Scales?
 A. He breaks free in the backyard, runs back into the house.
Q. What do you mean breaks free?
 A. As I grab ahold of him, he pulls away from me. We both slip. He slips, gets up before I get up. He runs into the house and shuts the door on me.
Williams explained on cross-examination that Scales was an arms length away from the dog and "attempting to turn the dog loose" when he pepper sprayed Scales to prevent his releasing the dog. He stated that he had previously been in situations where dogs had been released on him, even though his revolver had been drawn. He stated he observed no padlock on the chain or key in Scales' possession.
Scales testified to a version of events consistent with innocence. Misty Scales, who had not witnessed the event resulting in the aggravated menacing and resisting arrest charges, nevertheless corroborated Scales' testimony as to some of the before and after facts.
Aggravated menacing is defined as "knowingly causing another to believe that the offender will cause serious physical harm to the person." R.C.2903.21(A). Although Scales is correct that the evidence failed to establish that he touched the dog's chain, unlocked the padlock on the dog's chain, or even drew a key to do so, that did not necessarily undercut the credibility of Williams' testimony that Scales put him in fear of serious physical harm. There can be no doubt that a pit bull can inflict serious bodily harm. Williams testified that he had not seen a padlock. Chains can be secured without padlocks and released by hand. While Scales testified that the chain was secured by a padlock, that fact, if true, was not known by Williams so the fact that Scales had not reached the dog and didn't have a key in his hand did not necessarily undermine the credibility of Williams' testimony that Scales' words and actions had placed him in fear of serious bodily harm. Scales also contends that Williams couldn't have expected him to release the dog when he had his service revolver drawn, but Williams testified that he had experienced that very thing in the past. In our judgment, the aggravated menacing conviction is not against the manifest weight of the evidence.
Resisting arrest is defined as "recklessly or by force . . . resist(ing) or interfer(ing) with the lawful arrest of the person or another." R.C. 2921.33(A). It would appear from the trial court's decision and entry that Scales was found guilty of resisting his own arrest, and we confine ourselves to whether that finding is against the manifest weight of the evidence.
Scales argues that it was not credible that Williams could not have subdued him after pepper spraying him. However, the above quoted testimony clearly established that notwithstanding that he had been told he was under arrest and pepper sprayed, Scales broke away from Williams when he attempted to handcuff him, ran into his house, and shut the door on Williams. (Indeed, Williams testified that Scales continued to resist arrest after he and his brother later exited the house after the police had surrounded it). Assessing credibility of witnesses is the province of the trial court, and we are not persuaded that the trial court lost its way in accepting Williams' testimony.
Scales also contends that he could not have known he was under arrest because he was pepper sprayed before the actual attempt to arrest him "and given his obvious confused state of mind . . . it cannot be demonstrated that (he) was aware that he was under arrest when he allegedly resisted the same."
Williams testified, and the trial court so found, that Williams told Scales he was under arrest before he pepper sprayed him. The court could have reasonably concluded that Scales knew he was under arrest at the time he resisted Williams' efforts to handcuff him. His actions were entirely consistent with a desire to avoid being taken into custody.
In short, the trial court was confronted with a swearing match between Williams and Scales as to what happened in Scales' backyard. That the trial court chose to believe Williams does not mean that the court lost its way or has perpetrated a manifest miscarriage of justice.
The assignment of error is overruled.
The judgment will be affirmed.
BROGAN, J. and YOUNG, J., concur.